*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NM,

        Petitioner-Appellant,

v

JLS,

        Respondent-Appellee.

UNPUBLISHED
June 15, 2023

No. 361110
Wayne Circuit Court
LC No. 22-102738-PH

Before: REDFORD, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

Petitioner appeals as of right the trial court's order denying her request for a non-domestic personal protection order (PPO) against respondent. We affirm.

## I. BACKGROUND

On March 9, 2022, petitioner filed a petition for a nondomestic PPO. The petition alleged that respondent was "stalking" petitioner because respondent had allegedly (1) cursed, "thrown things at," and threatened petitioner "through phone messages, on Facebook messenger and in person," (2) called petitioner's husband's work and "spoke with at least 5 different people," and (3) "spoke with [petitioner's] husband on his work phone and told" him that petitioner "was doing all types of bad things." The petition requested that the court grant an ex parte PPO.

The following day, the trial court denied petitioner's request for ex part relief and scheduled the petition for a hearing via Zoom. In the notice of hearing, the trial court gave the parties instructions for how to access Zoom, and the court's expectations for the parties' behavior while on the Zoom call. The notice also included instructions for emailing evidence to the court that the parties could then present at the hearing, if they chose to do so.

The hearing commenced on April 7, 2022. At the start of the hearing, the trial court instructed the parties that it had not reviewed any evidence submitted by the parties, and explained that the parties would need to motion to admit the evidence as they saw fit, at which time the court could review it.

Petitioner then began testifying. According to petitioner, the thrust of the parties' dispute began on February 7 when respondent, who runs a dog rescue, asked petitioner to retrieve respondent's dogs from petitioner's friend, Carey, who was fostering the dogs. Petitioner said that she objected to doing this, to which respondent said that, if she had to go herself, she would involve social services and police. According to petitioner, she continued to refuse, which made respondent angry, and she "swore at [petitioner] many times."

Petitioner testified that, later, on February 16, respondent contacted Carey, "threatened [her]," and said that she was "coming to get the dogs immediately in the morning." Respondent then supposedly sent a text message accusing petitioner of being obstructive and abusive, and said that she "will file a lawsuit[.]" According to petitioner, respondent then sent the police to Carey's house, but did not go herself. Petitioner said that no one was home at the time, and petitioner and Carey eventually agreed to meet respondent at Gross Pointe town hall to give her the dogs.

Petitioner testified that she obtained a video of the ensuing exchange, during which respondent entered petitioner's vehicle while Carey was in the vehicle "sobbing because she was supposed to adopt one of the dogs, so she was just a wreck." Petitioner testified that respondent only got in her car to "harass" Carey. Petitioner said that respondent's actions scared her, and she begged respondent to get out of the car. According to petitioner, after respondent got out of the car, she started taking pictures of petitioner's car while petitioner was trying to get the dogs out. Petitioner testified that respondent "filmed the whole thing and the whole time she kept threatening me."

Petitioner testified that, after this exchange, respondent "was so angry" and "called [her] husband's work," where she talked to "[a]t least five" people "looking for [petitioner's] husband." According to petitioner, respondent called her husband to see if he was a police officer because petitioner supposedly told respondent that he was, but petitioner denied ever saying that. Petitioner again described respondent as "angry" and said it was "unnecessary for her to call" her husband's work.

At this point, petitioner's counsel moved for admission of all her exhibits, and proceeded to talk about messages in one exhibit that were apparently exchanged between petitioner and respondent. In those messages, respondent told petitioner that she needed mental help and supposedly threatened petitioner by saying that "[o]ther people are going to help" petitioner address her instability. The trial court never ruled on whether the exhibits were accepted.

Petitioner's counsel then returned to questioning petitioner. Petitioner testified that respondent contacted other dog rescues that petitioner volunteered with to ask about the "validity of [petitioner's] volunteering."

Petitioner then abruptly changed subjects and began testifying about police reports she made about respondent. She said that she filed a police report "in Fraser for stalking," and "one in Gross Pointe City for the event that happened when she got in my vehicle." She testified that her husband also made a police report in Shelby Township "for harassment" in connection with respondent's "unnecessary" call to his work.

Petitioner also said that, since she filed the petition, respondent has "had contact with" her by commenting "on certain things [on Facebook], threatening to sue petitioner," and "ma[king] an

angry face" on "old messages" that the two had exchanged on Facebook. She also testified that respondent "put" five "angry faces next to [petitioner's] personal photos" on Facebook.

Petitioner testified that she felt "awful," said that she is "afraid," and claimed that her children were "horrified." According to petitioner, her family "put up cameras because [her] son said he thought he saw a blue car outside," and he said that "the mean lady is outside of our house." Petitioner said that by the time she got to the front of the house, no one was there, but she was certain that respondent drove a blue car. Petitioner also testified that her other son called her and "begged" her to pick him up from work because he said "the mean lady that you talk about is here at my work." When petitioner asked him why, "he told [petitioner] he thought that he saw her, because [petitioner] showed him a picture of her after this all began." At the end of petitioner's testimony, her counsel again asked to admit all of petitioner's exhibits, but once again, the court did not respond.

At this point, the trial court stopped respondent from beginning her cross-examination of petitioner, and said:

> Before you begin [respondent], I'm [sic] want to say I'm a little lost. So some of these issues had to deal with things that happened between [respondent] and Carrie [sic]. Those are not for this Court. [Respondent] and [petitioner's] husband, those are not for this Court.

> But for [petitioner] directly, just so I'm clear, the Facebook notices with the angry emojis and then the screen shots of threats made by [respondent]. And are you indicating that those threats of her calling you unstable and you won't have to—others are going to help you?

Petitioner's counsel affirmed this was accurate.

Respondent was then allowed to resume her cross-examination. Respondent began by questioning petitioner about the identities of the five people at petitioner's husband's work that respondent contacted, but the trial court stopped the questioning, saying "this is so irrelevant." The trial court then explained how the hearing was supposed to work—petitioner was to testify about why she felt that she was "being stalked, threatened or harassed," and then respondent would have an opportunity to respond. The court then emphasized that it "clearly" did not understand why petitioner felt she was being stalked, threatened, or harassed, and that respondent's response was equally unhelpful. The trial court said that, at this point, it did not "see a need for a PPO," and that the court needed to see evidence about "[w]hat is specifically happening to [petitioner] that she feels she needs a PPO." The court said that it would give petitioner an opportunity to briefly explain "why she feels she needs this PPO," but emphasized that it did not "want the story about the dogs and the background and the history," and that it wanted petitioner to focus on what respondent has "done that you feel is threatening and stalking, so that [respondent] can respond to those things."

Petitioner responded by saying that respondent contacted her husband's work, to which the trial court pointed out that, if that was petitioner's complaint, then her husband "should ask for a PPO." The court then repeated its question to petitioner about why she needed a PPO, to which petitioner said:

She has stated she now knows where my address is. I don't know why she'd know that. My sons have both said they saw her. I can't prove that, but I'm sorry, you know. And then on top of it, she has contacted the rescue that I belong to in regards to the validity of me volunteering. Unnecessary information.

She does not need to know where I work. I'm not—I'm not affiliated with her. She knows nothing about me. She has contacted me on Facebook. She has threatened to sue me. It is getting to the point where I can't even walk out my door without somebody saying I just saw a blue car sitting in front of your house.

My husband put up cameras last night. I don't know if there's been a blue car. She drives a blue car.

The trial court then said, "That's helpful," and moved on to respondent.

Respondent admitted to calling petitioner's husband's work, but explained that this was because petitioner and Carey told her that petitioner's husband was a police officer, which respondent confirmed was false. Respondent otherwise denied contacting petitioner, claimed that petitioner was contacting her because Carey wanted a dog that respondent refused to give her, denied knowing anything about petitioner's children, and claimed that she did not own a blue vehicle, which could be verified with the Secretary of State. Respondent admitted to contacting rescues to see if petitioner volunteered there, but said that it was unrelated to this case, and that this was the only information she sought. Respondent claimed that she wanted no contact whatsoever with petitioner. Respondent then testified that, the day before petitioner filed her petition, petitioner created a Facebook page disparaging respondent's rescue. The trial court asked respondent about the "angry faces" on Facebook, and respondent said that she had "no idea" what petitioner was talking about.

The court eventually returned its attention to petitioner's counsel, and again asked why respondent's conduct warranted a PPO. Counsel responded by saying that respondent "will not leave [petitioner and her husband] alone," at which point the trial court interjected:

This is not what PPO court is for, not at all.

I will state to you, [respondent], if you are going past the home, do not. Do not reach out to her on Facebook. Do not contact her in any way. This is not what PPO is designed to protect.

It looks like you guys had a dog deal go south and everybody is upset about the dog deal. I can't really pinpoint what it is, because I'm not really understanding.

Even—you can't just present the Court will [sic] mounds of evidence and not be able to bring it forth in a hearing. It's not being brought forth to me.

After an argument with petitioner's counsel, the court again emphasized that petitioner's evidence was not "enough" to warrant a PPO. When petitioner's counsel continued to argue with the trial court, the court cut her off, saying, "This Court is denying the motion. I don't find that she's met her burden. You guys are all set. Thank you and have a great day."

The same day as the hearing, the trial court entered an order denying petitioner's petition for a PPO, explaining, "Petitioner failed to meet the burden of proof necessary to invoke relief from non-domestic stalking statute."

This appeal followed.

## II. PPO

On appeal, petitioner first argues that the trial court abused its discretion when it refused to issue a PPO against respondent. We disagree.

A trial court's decision with regard to a PPO is reviewed for an abuse of discretion. *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.*

Pursuant to MCL 600.2950a(1), "an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under . . . MCL 750.411h, 750.411i, and 750.411s." A PPO may only be issued under this subsection if the petition alleges facts that constitute stalking as defined in section MCL 750.411h or MCL 750.411i, or conduct that is prohibited under section MCL 750.411s. MCL 600.2950a(1). "The individual petitioning the trial court for a PPO bears the burden of proof." *Berryman v Mackey*, 327 Mich App 711, 718; 935 NW2d 94 (2019) (quotation marks and citation omitted).

Petitioner argues that she was entitled to a PPO under MCL 600.2950a(1) because she sufficiently demonstrated that respondent stalked her as that conduct is defined in MCL 750.411h. MCL 750.411h(1)(d) defines "stalking" as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Subsection (a) defines "course of conduct" as "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a). Subsection (c) defines "harassment" as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." MCL 750.411h(1)(c). Subsection (e) defines "unconsented conduct" as

> any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:
>
> (*i*) Following or appearing within the sight of that individual.
>
> (*ii*) Approaching or confronting that individual in a public place or on private property.
>
> (*iii*) Appearing at that individual's workplace or residence.

(*iv*) Entering onto or remaining on property owned, leased, or occupied by that individual.

(*v*) Contacting that individual by telephone.

(*vi*) Sending mail or electronic communications to that individual.

(*vii*) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual. [MCL 750.411h(1)(e).]

Finally, subsection (b) defines "emotional distress" as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." MCL 750.411h(1)(b).

Before addressing petitioner's substantive argument, we note that the trial court never admitted any of the parties' exhibits, so those exhibits are not part of the lower court record. Yet those exhibits contained all of the text and Facebook messages that the parties exchanged, and petitioner frequently relies on those messages on appeal. Because petitioner moved to admit these exhibits on multiple occasions and the trial court simply failed to rule on petitioner's motions, we will consider the content of those exhibits for purposes of thoroughly addressing petitioner's argument that she was entitled to a PPO.

Turning to petitioner's argument, she first contends that "[t]he events amounting to stalking [began] on February 7, when . . . Respondent threatened, 'I go its cops. Cops social services and carey is fully involved at that point." Neither party adequately developed the underlying facts that led to this text message, but it is clear that it was sent during the course of a text conversation between respondent and petitioner. Thus, the contact was clearly not unconsented, so for this contact to amount to conduct prohibited by MCL 750.411h, it must be conduct "that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested . . . ." MCL 750.411h(1)(d). It obviously was not. While having police officers involved may increase the tension of any situation, the presence of police officers mitigates the danger to either party—a police officer acts as a neutral third party whose presence insures the parties' interaction goes smoothly.

Petitioner then states that "police were indeed called to [petitioner's] friend Carey's house." This conduct was not directed towards petitioner, however, so it cannot be harassment of petitioner under MCL 750.411h(1)(c), nor can it otherwise constitute "stalking" as defined in MCL 750.411h(1)(d).

Petitioner next turns her attention to the parties' interaction during the dog exchange at the Grosse Pointe City Town Hall. Petitioner makes much of the fact that respondent entered petitioner's vehicle and had an interaction with Carey. Petitioner acknowledges that "this did not directly involve petitioner," but contends that it "was a trespass on her vehicle" and that respondent's behavior "contribute[d] to petitioner's fear of her." We fail to see how any of this involves petitioner, directly or otherwise. While it is true that respondent entered petitioner's vehicle, nothing suggests that respondent's entering the vehicle had anything to do with petitioner. Rather, as petitioner concedes, respondent entered the vehicle to interact with Carey. Because respondent's entering the vehicle to interact with Carey was in no way directed towards petitioner,

respondent's conduct in this regard does not amount to stalking. See MCL 750.411h(1)(c) and (d) (defining "stalking" as conduct involving harassment, and defining "harassment" as "conduct directed toward a victim").[1] Moreover, it is difficult to understand how respondent's entering of petitioner's car to interact with Carey would cause a reasonable person in petitioner's position to suffer significant mental suffering or distress. See MCL 750.411h(1)(b) and (c) (defining "harassment" as causing "emotional distress," and defining "emotional distress" as "significant mental suffering or distress").

Petitioner next recites evidence that respondent called petitioner's husband's place of employment, but this also does not constitute stalking of petitioner under MCL 750.411h because, once again, the conduct was not directed at petitioner. Petitioner argues that respondent's motive in contacting petitioner's husband was to interfere in petitioner's marriage, but even if that is true, petitioner cites no caselaw or other authority in support of her assertion that respondent's contact with a third party may constitute "stalking" of petitioner as that conduct is defined in MCL 750.411h. While such conduct may be inappropriate, it does not amount to stalking as defined in the relevant statute.[2]

Petitioner next complains about Facebook messages she received from respondent. Like with the text messages, however, these Facebook messages were sent during the course of a mutual conversation. Thus, for this contact to amount to conduct prohibited by MCL 750.411h, it must be conduct "that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested . . . ." MCL 750.411h(1)(d). Petitioner emphasizes messages in which respondent told petitioner that she needs mental help, that she needs "the rules of law explained to you," and that respondent will contact "the appropriate agencies," but it is unclear how such messages constitute stalking, or how they would make a reasonable person feel "terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411h(d). Moreover, petitioner ignores that the messages she complains of were sent in response to petitioner's barrage of disparaging messages to respondent. In these messages, petitioner said things to respondent like "you suck at life you suck you suck so bad at life you're not even good at life because you are a bad mean harassing psychotic human," "you cannot argue with crazy and you're crazy I can't argue with you because no matter what I say . . . you're a psycho," and "it must suck to be you got [sic] it sucks to be you you suck at life . . . ." It is also unclear how it was threatening when respondent told petitioner she "need[s] mental health" when petitioner told respondent essentially the same when she said, "You're mentally unstable and sick." Further, while petitioner tried to have the last word later in the conversation by telling respondent to leave

---

[1] Petitioner emphasizes that respondent's entering of the vehicle nevertheless could have contributed to petitioner's fear of respondent. While respondent's arguably erratic conduct may have scared petitioner, the conduct was not directed at petitioner, and petitioner's subjective fear alone does not transform respondent's conduct into conduct prohibited by MCL 750.411h.

[2] We also note that petitioner's assertion that she felt threatened by respondent's conduct is undermined by her subsequent messages to respondent. Not only did petitioner continue contacting respondent, but in reference to respondent calling petitioner's husband's place of employment, petitioner said, "Do u have nothing better to do? Lol I find it humorous." In a later message, she repeated that she "had a long talk with my husband and we all laughed about it . . . ."

her alone, in the sentence immediately before, she seemingly told respondent to contact her directly, saying, "Leave my husband alone. Leave anyone alone that your [sic] going through to get to me and be a big girl and come straight to the source. LEAVE ME ALONE!!!!! GO!!!" It is also clear that petitioner did not actually wish for respondent to stop contacting her because, after respondent responded to this message, petitioner exchanged at least eight more messages with respondent, and both sides continued to antagonize one another.

Thus, to summarize, the Facebook messages in no way support that respondent was stalking petitioner as that term is used in MCL 750.411h. Both parties were exchanging immature and disparaging remarks with one another. While snippets of the parties' exchange, taken in isolation, may paint a concerning picture, the messages must be read in context. See *Berryman*, 327 Mich App at 724. In context, nothing in the messages rises to the level of stalking. Both parties were being unreasonable and making inappropriate comments to the other. The solution to end this type of conduct is to be reasonable and end the conversation; it does not require a PPO.

Petitioner next complains that respondent contacted the dog rescue that petitioner volunteered at, but, like many of petitioner's allegations, this contact was not directed at petitioner and thus does not support that respondent "stalked" petitioner as that term is used in MCL 750.411h.

Petitioner also complains that "Respondent went through petitioner's Facebook and posted angry emoji faces," and that "she put another angry emoji Face on old communications between them." It is unclear whether this contact was unconsented, and petitioner does not analyze the issue. Regardless, assuming that this was unconsented contact, receiving a few Facebook notifications would not cause a reasonable person significant mental suffering or distress, such that it does not amount to harassment under MCL 750.411(1)(c) or stalking under MCL 750.411h(1)(d). Petitioner further states that respondent "publicly threatened to sue Petitioner," but it is unclear how this constitutes stalking. While the threat of legal action may cause one stress, this does not transform that conduct into stalking under MCL 750.411h.

Accordingly, none of respondent's conduct that petitioner highlights on appeal is the type of conduct prohibited by MCL 750.411h. The trial court did not abuse its discretion when it denied petitioner's request for a PPO because, as the court properly concluded, petitioner failed to meet her burden of proof.[3]

---

[3] At oral argument, petitioner suggested that the trial court's ruling should be vacated in light of this Court's recent opinion in *PC v JLS*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 361161). In that case, this Court held that the trial court's decision to deny the petitioner's request for ex parte relief "by merely concluding that the allegations are 'insufficient' for ex parte relief" did not comply with the statutory requirements in MCL 600.2950a(7). *PC*, ___ Mich App at ___; slip op at 1. We conclude that *PC* does not mandate a different result in this case for multiple reasons. First, at issue in *PC* was a request for ex parte relief, and no hearing had been held when the trial court issued its order denying the petitioner's request for relief. See *id*. at ___; slip op at 4-5. Here, in contrast, at issue is the trial court's decision on petitioner's request for a PPO (not ex parte), after the trial court held a hearing on the issue. Second, as will be explained in Part IV

-8-

### III.  DUE PROCESS

Next, petitioner presents a cursory argument that her right to due process was violated "in various ways," including when the trial court ended the hearing "without notice to the parties" and when the trial court failed to allow petitioner to present two witnesses who could have testified about respondent's attempt to contact petitioner's husband at his place of employment. Problematically, petitioner fails to cite any caselaw or other authority for support of her various arguments about how the trial court deprived her of due process; she merely makes the assertions without further development.  As explained by our Supreme Court:

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.  The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.  Failure to brief a question on appeal is tantamount to abandoning it.  [*Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) (citations omitted).]

Accordingly, we consider petitioner's arguments abandoned, and decline to address them.

### IV.  SUFFICIENCY OF TRIAL COURT'S FINDINGS

In her final argument, petitioner contends that the trial court failed to follow the court rules when it issued its findings.  Whether the trial court properly applied the court rules is reviewed de novo.  *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009).

Petitioner contends that the trial court failed to follow MCR 2.517 and MCR 3.705(B)(6)[4] because it did not make sufficient findings of fact and conclusions on the record.  MCR 2.517(1)(A) states, "In actions tried on the facts without a jury or with an advisory jury, the court

---

of this opinion, we conclude that the trial court sufficiently stated its findings on the record.  We acknowledge that Part IV of this opinion does not address MCL 600.2950a(7), which was the basis for this Court's ruling in *PC*.  That omission, however, is due to petitioner's failure to argue at any point in her brief that the trial court failed to comply with that subsection.  While *PC* was not published when petitioner filed her appeal, that opinion did nothing more than apply the plain language of MCL 600.2950a(7).  Because petitioner never cited MCL 600.2950a(7) in her brief on appeal or otherwise argued in her brief that this subsection was violated, we conclude that any such argument is abandoned.  See *Steward v Panek*, 251 Mich App 546, 558; 652 NW2d 232 (2002) ("However, plaintiffs abandoned this issue by failing to brief it on appeal.").  Finally, and most importantly, this Court in *PC* held that a trial court's failure to comply with MCL 600.2950a(7) is subject to harmless-error review.  *PC*, ___ Mich App at ___; slip op at 5.  This opinion carefully walks through all of petitioner's evidence that she claims entitles her to a PPO, accepts that evidence as true, and explains why petitioner is still not entitled to a PPO.  Accordingly, to any extent that the trial court in this case may have run afoul of *PC* or MCL 600.2950a(7), we would conclude that the error was harmless.

[4] On appeal, petitioner cites to MCR 3.706(B)(6), but no such subsection exists.

shall find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment." Subsection (A)(2) provides, "Brief, definite, and pertinent findings and conclusions on the contested matters are sufficient, without over elaboration of detail or particularization of facts." MCR 2.517(A)(2). MCR 3.705(B)(6) relates specifically to hearings for PPOs, and provides:

> At the conclusion of the hearing the court must state the reasons for granting or denying a personal protection order on the record and enter an appropriate order. In addition, the court must state the reasons for denying a personal protection order in writing, and, in a proceeding under MCL 600.2950a, the court must state in writing the specific reasons for issuance of the order.

The trial court plainly complied with all of these rules. At the end of the hearing, the court explained that it was denying petitioner's request for a PPO because it found that petitioner failed to satisfy her burden of proof. In the order the court entered following the hearing, it stated that it denied petitioner's request for a PPO because "Petitioner failed to meet the burden of proof necessary to invoke relief from non-domestic stalking statute." While not overly detailed, the trial court provided a brief, definite, and pertinent conclusion such that MCR 2.517 was satisfied. MCR 3.705(B)(6) was likewise satisfied because the court stated its reasons for denying the PPO on the record and in writing.

Petitioner also complains that the trial court "erred when [it] failed to make rulings on petitioner's proposed exhibits despite them being identified by the Petitioner and counsel requesting on two occasions for their admission," but it is unclear how alleged error relates to MCR 2.517 or MCR 3.705(B)(6). Moreover, petitioner testified about the exhibit's contents, and petitioner does not explain how the trial court's ruling may have been different had it reviewed the exhibits. Indeed, it seems that the trial court accepted petitioner's testimony as true (even without the exhibits supporting it) and concluded that petitioner was nevertheless not entitled to a PPO. Accordingly, we conclude that, to the extent that the trial court may have erred by not reviewing petitioner's exhibits, the error was harmless. See MCR 2.613(A).

Affirmed.


/s/ James Robert Redford
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney